

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Kathleen O. Gavin*
*Assistant United States Attorney*
*Kathleen.Gavin@usdoj.gov*

*Suite 400*
*36 S. Charles Street*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4887*
*MAIN: 410-209-4800*
*FAX: 410-962-3091*

HEE 8/3/21

August 3, 2021

Richard A. Finci, Esquire
Houlon, Berman, Finci & Levenstein, LLC
7850 Walker Drive, Suite 160
Greenbelt, Maryland 20770
finci@houlonberman.com

Re: *United States v. Godlove Nche Mancho*
Criminal Case No. __2 / - 3 2 2__

Dear Mr. Finci:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Godlove Nche Mancho (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by August 11, 2021, it will be deemed withdrawn. The terms of the Agreement are as follows:

## Offenses of Conviction

1.      The Defendant agrees to waive Indictment and plead guilty to a two count Information to be filed against him, charging the Defendant with conspiracy in violation of 18 U.S.C. §371 and a violation of the Arms Export Control Act in violation of 22 U.S.C. §2778. The Defendant admits that the Defendant is, in fact, guilty of those offenses and will so advise the Court.

## Elements of the Offenses

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

That on or about the time alleged in the Information, in the District of Maryland,

1

Gᵣᴍ

Conspiracy – Count One
(18 U.S.C. §371)

a.  The Defendant and at least one other person entered into an unlawful agreement;

b.  The purpose of the agreement was to commit violations of United States law,

c.  The Defendant knowingly and willfully became a member of the conspiracy; and

d.  The Defendant or a co-conspirator committed at least one overt act in furtherance of the conspiracy.

Arms Export Control Act – Count Two
(22 U.S.C. §2778(c); 22 C.F.R. §121.1)

a.  The Defendant exported the articles identified in the Information;

b.  The articles were listed on the United States Munitions List at the time of the export;

c.  The Defendant did so without obtaining a license from the State Department; and

d.  The Defendant acted willfully.

Penalties

3.  The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|---------------------|
| 1 | 18 U.S.C. § 371 | n/a | 5 years | 3 years | $250,000 or twice the amount of gross gain or loss caused by the offense | $100 |

GM

| 2 | 22 U.S.C. §2778(c); 22 C.F.R. §121.1 | n/a | 20 years | 3 years | $1,000,000 | $100 |

       a.     Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

       b.     Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

       c.     Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

       d.     Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

       e.     Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

       f.     Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

     4.     The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

       a.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel.

That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the

Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a.     This Office and the Defendant further agree that the applicable base offense level is twenty-six (26) pursuant to United States Sentencing Guidelines ("U.S.S.G.") §2M5.2.

b.     This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

### Disputed Guideline Factor

7.     The parties disagree as to whether there should be an adjustment to the guideline calculation on account of the Defendant's role in the offense. The Defendant reserves the right to argue for a role reduction of up to 3 levels and this Office is free to oppose any such reduction.

8.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

9.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

10.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Information.

Waiver of Appeal

11.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

c.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statutes to which the Defendant is pleading guilty are unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statutes, to the extent that such challenges legally can be waived.

d.     The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

i.     The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

ii.        This Office reserves the right to appeal any sentence below a statutory minimum.

e.        The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

12.        The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13.        Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in all of the items listed on Attachment B, which is incorporated herein. The Defendant agrees to consent to the entry of orders of forfeiture for the property described in Attachment B and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14.        The Defendant agrees to assist fully in the forfeiture of the property listed in Attachment B. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.        The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Abandonment of Property

16.        The Defendant agrees to abandon and relinquish any claim of ownership or right to the property described in Attachment C, and agrees that the United States may destroy or otherwise dispense with that property in any way that it deems appropriate.

## Defendant's Conduct Prior to Sentencing and Breach

17.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

19.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

20.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to us promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

Kathleen O. Gavin
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

8/10/21
Date

Godlove Nche Mancho

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

8/10/21
Date

Richard A. Finci, Esquire

9

GM

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Beginning in or before November 2017, and continuing until on or about July 19, 2019, the defendant, Godlove Nche Mancho ("Mancho"), a resident of Maryland, conspired with Tamufor St. Michael, Roger Akem, Walters Alambi Muma, Edith Ngang, and others to export, and did export, ammunition, firearms and various other items from the United States in violation of 18 U.S.C. §554 (smuggling); 22 U.S.C.§ 2778 (the Arms Export Control Act ("AECA")); 50 U.S.C. §§ 4801 *et seq.* (the Export Control Reform Act of 2018 ("ECRA"); 50 U.S.C. §§1701-1707 (the International Emergency Powers Act);13 U.S.C. § 305 (unlawful export information); to engage in the business of importing, manufacturing and dealing in firearms without a license and in the course of such business ship, transport and receive firearms in interstate and foreign commerce in violation of 18 U.S.C. §922(a)(1); to deliver to a common carrier for transport in foreign commerce items that contained firearms and ammunition without providing written notice to the carrier in violation of 18 U.S.C. §922(e), and to transport and cause to be transported in foreign commerce firearms with obliterated serial numbers in violation of 18 U.S.C. §922(k).

In furtherance of the conspiracy, St. Michael, Akem and others purchased, both over the Internet and in person, large amounts of ammunition, ammunition reloading supplies, firearms, firearm parts and various other military-type items for the purpose of shipping them overseas between March 2018 and July 2019. Once purchased, the items were sent to St. Michael's residence on Golden Ring Road in Rosedale, Maryland. The purchased items included:

- Nine separate shipments of ammunition, tools and equipment for reloading and manufacturing firearms sent by MidwayUSA.com, an online reseller, between March 2018 and March 2019;

- Approximately 134 orders placed through St. Michael's account at Gunbroker.com, an on-line auction site, including:

  a.  March 5, 2018, Item Title: CCI #35 Primers for 50 cal Ammunition 80ct NIP
  b.  March 28, 2018, Item Title: RCBS FL Die Set 7.62x39 GP-A
  c.  March 28, 2018, Item Title: 52 50 BMG Brass shell Casings
  d.  March 28, 2018, Item Title: 7.62x39 AK47 AK once fired Brass – 500 pcs
  e.  April 8, 2018, Item Title: Trip Wire Noise Alarm 12 GA Primer Compact
  f.  April 11, 2018, Item Title: Avon M50 GAS Mask

1

    g. May 7, 2018, Item Title: M81 Military Fuse Lighter Fired

    h. October 8, 2018, Item Title: Savage 10 LRH 338 Lapua Mag 26" Barrel NIB 57037

    i. November 14, 2018, Item Title: Tannerite Exploding Targets 10lb Legal Explosives

    j. March 25, 2019, Item Title: Tapco SKS Gas Piston.

- 450 boxes of Tula .233 caliber ammunition (a total of 9000 rounds) sent by Sports South LLC on April 3, 2019; and

- 400 pieces of "as-is 50 BMG cases," ordered on July 27, 2018 from Brassbombers.com, an internet site that advertises itself as a company that sells "once fired military brass for reloading."

Between approximately November 24, 2017 and July 1, 2019, St. Michael also purchased at least 24 different rifles online, all of which he picked up at a firearms retailer located in Essex, Maryland. For each purchase, St. Michael completed an ATF Firearms Transaction Form 4473 in which he certified that he was the actual transferee or buyer of the firearm. These certifications were false, because St. Michael purchased each of the firearms for the purpose of exporting them. One of the purchases was for a Noreen Rifle, Model ULR, .50 caliber, bearing serial number U1508, which St. Michael picked up from the Essex retailer on April 19, 2018. Another purchase was for a Norinco Rifle, Model SKS, 7.62 mm, bearing serial number 2407980P, which St. Michael picked up from the Essex retailer on December 14, 2018.

Mancho participated in multiple meetings of the conspirators, both on-line and in person at various locations, including in the basement of St. Michael's residence. The conspirators, including Mancho, used a variety of code words in their online private group chats to discuss the ammunition and weapons that they were obtaining and packaging for the shipment. For example, they referred to various rifles, including AK-47s, as "sticks," ammunition as "groundnuts," "gnuts" or "pnuts," and St. Michael's basement as "the lab." The conspirators, including Mancho, used the lab to reload ammunition, assemble firearms and wrap the various items listed above for overseas shipment. The conspirators, including Mancho, also pledged and contributed funds towards the purchase of various firearms and other items for shipment in the containers.

On multiple occasions, Mancho donated or forwarded funds received from other conspirators to St, Michael for the purchase of ammunition and/or weapons in furtherance of the conspiracy. For example, on January 13, 2019, sent to St. Michael, via CashApp, two payment so $1,500, one with the notation "more groundnuts," and the other with the notation "groundnuts."

On June 19, 2019, St. Michael posted a message on one of the private group chats used by the conspirators stating: "I just got an offer for a 50 BMG single shot with scope for $3200.00 Please lets try to make headway before it goes." After another conspirator responded: "I love 50 BMG, its my baby," Mancho posted "Me too. Put me down for $500." Three days late, on June

22, 2019, Mancho sent $500 to St. Michael, using the online application CashApp, with the notation "for 50 BMG."

In or about December 2018, the shipping container, bearing the identification number GESU456254, was delivered to the street outside of the Golden Ring Road residence. St. Michael and other co-conspirators loaded the container, secreting various weapons, ammunition and other military-type items inside a Toyota truck and several compressors, before causing the container to be sent back to the Port of Baltimore for export. On December 22, 2018, a freight forwarder who was a member of the conspiracy, urged other members to devote more time to loading the container, stating in a private group chat used by the conspirators: "Please can we pick days that we can show up for some work. It is risky having container sit on a residential lot for many days. It will draw the attention of the authorities which we don't want."

On or about January 17, 2019, Container No. GESU456254 departed the Port of Baltimore, Maryland with a destination of Onne, Nigeria. The electronic export information ("EEI") for the container, which the conspirators caused to be filed with the Department of Commerce as required by 13 U.S.C. §305, listed the contents of the container as one Toyota Tundra truck, one 1989 Toyota truck, and "doors and frames." The EEI further listed the U.S. Principal Party in Interest ("USPPI") as an individual with the initials M.A.O. with a non-existent address of 670 Golden Ring Rd., Rosedale, MD 21237. M.A.O. was also listed as the intermediate and ultimate consignee for the container shipment with an address in Nigeria. The telephone number listed for M.A.O. on the EEI corresponded with a pre-paid, and therefore, non-traceable, cellular telephone.

Not long after that shipment had departed the Port of Baltimore, concerns were raised among the conspirators about security at St. Michael's basement. In response, Mancho posted the following message on one of the private group chats used by the conspirators on February 12, 2019: "We should have a bin by the door. Everyone entering the lab must put his phone inside. If anybody phone rings, he picks it [sic] go outside and take call."

On or about February 25, 2019, the shipping line was ordered to re-deliver Container No. GESU456254 back to the Port of Baltimore. The Order of Re-Delivery also required that the contents of the container were to remain intact and sealed when discharged in the Port of Baltimore.

On May 20, 2019, following its return to Baltimore, law enforcement personnel unsealed the container and examined its contents. In addition to what appeared to be the contents of an old schoolhouse (desks, chairs, doors, frames), household goods and clothing, and industrial goods, the two Toyota vehicles listed on the EEI were in the container. The cab area of the 1989 truck contained vehicle registration and title records for the vehicle, bearing the name of Edith Ngang. Hidden in the back of the 1989 Toyota truck were four black duffle bags. The duffle bags contained one (1) high-capacity magazine, Bellville brand (military-style and desert-colored) boots, and Camelbak brand hydration packs. Attached to each duffle bag was an airline-issued baggage tag containing the name of Roger Akem.

3

Also hidden in the rear portion of the 1989 Toyota truck's cargo area were numerous packages wrapped in aluminum foil, duct taped and then over wrapped with green-colored plastic wrap. The wrapped packages contained, among other things: four (4) .223 caliber semi-automatic "AR-style" rifles; nine (9) high-capacity .223 caliber magazines; approximately five-thousand (5000) .223 caliber bullets; two-thousand (2000) Remington shell casings; four (4) pounds of mixed .223 caliber shell casings; CCI Primers; eight (8) pounds of AR-Comp gun powder; tannerite powder; forty (40) small canisters of pepper spray; one brass knuckle; two (2) riflescopes; and a "ghillie suit," which is clothing specifically designed to camouflage the wearer outdoors and is often worn by snipers. The ghillie suit package had a shipping label still affixed, addressed to St. Michael at the Golden Ring Road residence.

A second cardboard box found in the 1989 Toyota truck bore an Amazon shipping label that was addressed to St. Michael at the Golden Ring Road residence. Contained in that box were a variety of items, including pepper spray, plastic zip-tie style handcuffs, (1) one brass knuckle, and other military-type items.

Other items found in the container included a RCBS die set, gas masks, trip wire, ammunition reloading tools and equipment, twenty pounds of sulfur powder, practice grenade fuses, tannerite powder, gun powder, pepper spray, a fully-assembled (inert) improvised explosives device, bladed weapons, body armor, and other military surplus items.

During a second search of the container, which was conducted on August 1, 2019, 35 firearms were found secreted in six different sealed compressors. One of those firearms was a Norinco Rifle, Model SKS, 7.62 mm, with an attached tag bearing the same serial number as the rifle purchased by St. Michael on December 14, 2018. The serial number on the rifle itself had been obliterated.

Another firearm recovered from the container on August 1, 2019, was the Noreen Rifle bearing serial number U1508 that St. Michael had purchased in April 2018. An additional 25 other firearms, all of which had obliterated serial numbers, were found during that second search of the container. Those 25 firearms were similar to the makes and models of firearms that St. Michael had purchased.

Many of the items ordered and shipped to St. Michael's residence, identified above, also matched the types of ammunition and other military-type items found in the container. All of the firearms, magazines, ammunition, and primers found in the container were defense articles designated on the United States Munition List, and required a license from the DDTC prior to export. The rifle scopes were dual-use items controlled on the Commerce Control List under Export Control Classification Number 0A987, and required a license for export to Nigeria. Thirty of the firearms in the container had obliterated serial numbers.

After law enforcement personnel searched the container and removed the items that required an export license, in May, 2019, they transferred custody of the container to Customs and Border Protection ("CBP"). Between June 4, 2019 and June 12, 2019, St. Michael, who did not know that law enforcement had searched the container, contacted the CBP several times, seeking information about the container's status. Over the course of these several contacts, St.

Michael identified himself by name, provided his cellular telephone number, told the CBP officer that the container had not been exported in his name, indicated that he was one of five individuals who had put the shipment together for export and that he, along with the other four individuals, had cargo in the container. St. Michael eventually told the CBP officer that M.A.O. was listed on the dock receipt and that M.A.O. had helped St. Michael load the container. Finally, St. Michael sent an email to the CBP officer on June 12, 2019 in which he listed himself and several others, including Co-conspirators # 1 and 2, as being "involved and/or related to container # GESU4562654." St. Michael also attached to that e-mail copies of the dock receipt and titles for the two Toyota trucks found in the container.

On July 19, 2019, law enforcement agents executed a search warrant at St. Michael's Golden Ring Road residence. The basement of the residence contained machinery and equipment for the manufacturing of firearms and re-loading of ammunition as well as numerous rifles and handguns, various firearms parts and accessories, a silencer, rifle scopes, powder, reloading equipment, and thousands of rounds of ammunition.

Neither Macho, nor any of his co-conspirators, ever possessed the necessary licenses or authorizations from the United States Department of State or Department of Commerce to export the above-listed firearms, ammunition or rifle scopes. Mancho further knew that licenses were required to export those items to Nigeria.


SO STIPULATED:

Kathleen O. Gavin
Assistant United States Attorney

Godloye Nche Mancho
Defendant

Richard A. Finci, esquire
Counsel for Defendant

**ATTACHMENT B**

**A. Items Seized from Container No. GESU456254 on May 20, 2019**

1.  AMMUNITION: AMMUNITION, QTY: 2, MNF: LC (LAKE CITY), CAL: 556

2.  FIREARM: RIFLE, MNF: COLT, TYPE: RIFLE, MODEL: M4, CAL: 223, SN: OBLITERATED, OBLITERATED: YES

3.  FIREARM PARTS AND ACCESSORIES, (1) ONE MAGPRO AK-47 EXTENDED MAGAZINE FOUND WITH ITEMS 4-9

4.  HORNADAY HANDHELD PRIMING TOOL

5.  (2) TWO BOTTLES HODGDON COPPER FOULING ERASER

6.  (3) THREE 500 COUNT BAGS OF 5.56 BULLETS (PROJECTILES)

7.  1 CASE CREEDMOOR UNPRIMED 5.56MM CASINGS FROM HORDNADY MANUFACTURING TO GRAF AND SONS PLUS PACKAGING

8.  (1) BOX OF HORNADAY .223 UNPRIMED BRASS FROM DAMAGE INDUSTRIES TO PRECISION OUTFITTERS

9.  HORNADAY POWDER DISPENSER

10. LEE PRECISION BREECH LOCK CHALLENGER PRESS #90588 PLUS PACKAGING

11. LEE PRECISION BREECH LOCK CHALLENGER PRESS #90588 PLUS PACKAGING

12. (8) BOTTLES SPECTRACIDE STUMP REMOVER 16OZ

13. 20 POUNG BAG OF GREENWAY BIOTECH SULFUR POWDER

14. (1) ONE BOX WITH UNPRIMED .223 CA CASINGS (LABEL SAYS 2000) AND 3 (THREE) BOXES OF CCI NO. 44 PRIMERS FOR 5.56 AMMO

15. (1) BOTTLE 8-POUND SMOKELESS POWDER

16. FIREARM PARTS AND ACCESSORIES, (4) NEW PMAG 5.56 MAGAZINES

17. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

18. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

19. FIREARM PARTS AND ACCESSORIES, (4) NEW PMAG 5.56 MAGAZINES

20. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

21. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

22. RELOADING KIT TO INCLUDE RELOADING WORKBOOK, LEE AUTODRUM POWDER MEASURE, WINCESTER PRIMERS (1000), (2) BOXES CCI #400 (1000 PER BOX), LEE 4 WHOLE TURRENT PRESS

23. RELOADING KIT TO INCLUDE (2) TWO WINCESTER .308 FULL LENGTH DIE SET, LEE UNIVERSAL SHELL HOLDER (SH2069) AND RCBS 7.62 TOOL AND DIE SET

24. (5) FIVE 500 COUNT BAGS OF 5.56 BULLETS (PROJECTILES)

25. (5) FIVE 2 POUND JARS OF TANNERITE FROM TANNERITE..COM WITH PACKAGING

26. (2) ONE POUND CONTAINERS OF "BEAVER DAM BUSTER EXPLODING TARGET"

27. (40) FORTY PEPPER SPRAY CANISTERS

28. (1) BRASS KNUCKLE

## B. Items Seized from 6701 Golden Ring Rd., Rosedale, Maryland on July 19, 2019

1. FIREARM: RIFLE, MNF: RUGER, TYPE: RIFLE, MODEL: MINI 30 RANCH RIFLE, CAL: 762, SN: 581-65669

2. FIREARM: HANDGUN, MNF: SMITH & WESSON, TYPE: REVOLVER, MODEL: 66, CAL: 357, SN: CEL1168

3. FIREARM: HANDGUN, MNF: FOREHAND & WADSWORTH, TYPE: REVOLVER, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: 9335

4. FIREARM: RIFLE, MNF: RUGER, TYPE: RIFLE, MODEL: PRECISION RIFLE, CAL: 308, SN: 1802-20007

5. FIREARM: HANDGUN, MNF: DAREINGARMS, LLC, TYPE: PISTOL, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: 053206

6. FIREARM: RIFLE, MNF: CHINESE, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: 1300638

7. FIREARM: HANDGUN, MNF: GLOCK INC., TYPE: PISTOL, MODEL: 43, CAL: 9, SN: BEEY731

8. FIREARM PARTS AND ACCESSORIES, 4 MAGAZINES AND ORIGINAL TRIGGER TO ITEM #49

9. FIREARM: RIFLE, MNF: SAVAGE ARMS INC. (CD), TYPE: RIFLE, MODEL: 64, CAL: 22, SN: 1441779

10. SILENCER: NONE, 9MM GEMTECH S/N: S16-103678

11. FIREARM: OTHER FIREARM, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

12. FIREARM PARTS AND ACCESSORIES, 80% JIG PARTS

13. FIREARM PARTS AND ACCESSORIES, RANDOM GUN PARTS

14. FIREARM PARTS AND ACCESSORIES, AR PARTS

15. FIREARM PARTS AND ACCESSORIES, RANDOM GUN PARTS

16. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

17. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

18. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

19. FIREARM PARTS AND ACCESSORIES, FIREARMS PARTS

20. FIREARM PARTS AND ACCESSORIES, AR 80% LOWER JIG

21. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

22. FIREARM PARTS AND ACCESSORIES, VARIOUS AK PARTS AND ACCESSORIES

23. FIREARM PARTS AND ACCESSORIES, VARIOUS FIREARM MAGAZINES

24. FIREARM PARTS AND ACCESSORIES, 6 UNMILLED 80% RECEIVERS

25. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

26. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

27. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

28. IED COMPONENTS

29. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

30. TOOLS TO MANUFACTURE BLACK POWDER

31. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

32. FIREARM PARTS AND ACCESSORIES, JIG AK ONE MILLIMETER PUNCH

3

33. FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL:  UNKNOWN TYPE, CAL: ZZ, SN: NONE

34. 6 BINARY RIFLE TARGETS AND BRAND MIXING CONTAINER

35. FIREARM PARTS AND ACCESSORIES, "GAT CRANK"

36. FIREARM PARTS AND ACCESSORIES, .50 CAL RIFLE ROD

37. FIREARM PARTS AND ACCESSORIES, 10 RIFLE SCOPES

38. FIREARM: OTHER FIREARM, MNF:  UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL:  UNKNOWN TYPE, CAL: ZZ, SN: NONE

39. AMMUNITION,  QTY:  103, MNF: OTHER, CAL: 9

40. AMMUNITION,  QTY:  36, MNF: OTHER, CAL: 762

41. AMMUNITION,  QTY:  60, MNF: OTHER, CAL: 300

42. AMMUNITION,  QTY:  50, MNF: OTHER, CAL: 308

43. FIREARM: OTHER FIREARM, MNF:  UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL:  UNKNOWN TYPE, CAL: ZZ, SN: NONE

44. AMMUNITION,  QTY:  10, MNF: OTHER, CAL: 40

45. AMMUNITION,  QTY:  24, MNF: OTHER, CAL: 12

46. AMMUNITION COMPONENTS,  QTY:  25, MNF: OTHER, CAL: ZZ

47. AMMUNITION COMPONENTS,  QTY:  500, MNF: OTHER, CAL: 45

48. AMMUNITION COMPONENTS,  QTY:  220, MNF: OTHER, CAL: MULTI

49. AMMUNITION COMPONENTS,  QTY:  180, MNF: OTHER, CAL: 556

50. AMMUNITION COMPONENTS,  QTY:  50, MNF: OTHER, CAL: MULTI

51. AMMUNITION COMPONENTS,  QTY:  592, MNF: OTHER, CAL: 45

52. AMMUNITION COMPONENTS,  QTY:  462, MNF: OTHER, CAL: 9

53. AMMUNITION,  QTY:  287, MNF: OTHER, CAL: 38

54. AMMUNITION COMPONENTS,  QTY:  1120, MNF: OTHER, CAL: 50

55. 8LB SMOKELESS POWDER, 2 BAGS OF SMOKELESS POWDER, 2 BAGS OF HOPPER SMOKELESS POWDER, 2 CONTAINERS SMOKELESS POWDER, 10 SMOKELESS POWDER CONTAINERS, PISTOL POWDER FROM RELOADING EQUIPMENT, AND OTHER RELATED ITEMS

56. AMMUNITION,  QTY:  900, MNF: OTHER, CAL: MULTI

57. AMMUNITION COMPONENTS,  QTY:  1020, MNF: OTHER, CAL: MULTI

58. AMMUNITION COMPONENTS,  QTY:  2280, MNF: OTHER, CAL: 338

4

59.  AMMUNITION, QTY: 30, MNF: OTHER, CAL: 223

60.  FIREARM: RIFLE, MNF: REMINGTON ARMS COMPANY, INC., TYPE: RIFLE, MODEL: 700, CAL: 300, SN: RR92045B

61.  AMMUNITION, QTY: 410, MNF: OTHER, CAL: MULTI

62.  AMMUNITION COMPONENTS, QTY: 1370, MNF: OTHER, CAL: 50

63.  AMMUNITION, QTY: 1740, MNF: OTHER, CAL: 50

64.  AMMUNITION COMPONENTS, QTY: 160, MNF: OTHER, CAL: 12

65.  AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 50

66.  AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 50

67.  AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 50

68.  AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 50

69.  AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 50

70.  AMMUNITION COMPONENTS, QTY: 50, MNF: OTHER, CAL: 338

71.  FIREARM PARTS AND ACCESSORIES, (2) BAGS OF FIREARM BARREL CLEANER BRUSHES

72.  AMMUNITION COMPONENTS, QTY: 100, MNF: OTHER, CAL: ZZ

73.  FIREARM: RIFLE, MNF: NOREEN FIREARMS LLC, TYPE: RIFLE, MODEL: BAD NEWS ULR, CAL: 50 BMG, SN: U1480

74.  OTHER: FIREARM PARTS AND ACCESSORIES, 1 UNMILLED LOWER RECEIVER

75.  AMMUNITION - ASSORTED, QTY: 4, MNF: ASSORTED, CAL: 50

76.  CHEMICALS: OTHER, 1- CONTAINER OF "STUMP REMOVER"

78.  FIREARM: OTHER FIREARM, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

79.  FIREARM: OTHER FIREARM, MNF: UNKNOWN MANUFACTURER, TYPE: RECEIVER/FRAME, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

80.  RELOADIGN PRESS AND EQUIPMENT (12 ITEMS IN 5 BOXES)


C. **Items Seized from 2569 Copper Cliff Trail, Woodbury, Minnesota on July 19, 2019**


1.  AMMUNITION - ASSORTED, QTY: 8, MNF: ASSORTED, CAL: MULTI

2.  AMMUNITION, QTY: 51, MNF: ASSORTED, CAL: MULTI



**D. Items Seized from Container No. GESU456254 on August 1, 2019**

1.  FIREARM: RIFLE, MNF:  REMINGTON ARMS COMPANY, INC., TYPE: RIFLE, MODEL:  700, CAL: 300, SN: NONE, OBLITERATED: YES

2.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

3.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

4.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

5.  FIREARM: SHOTGUN, MNF:  REMINGTON ARMS COMPANY, INC., TYPE: SHOTGUN, MODEL:  870, CAL: 12, SN: NONE, OBLITERATED: YES

6.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

7.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

8.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

9.  FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  UNKNOWN TYPE, CAL: ZZ, SN: NONE

10. FIREARM: RIFLE, MNF:  NORINCO (NORTH CHINA INDUSTRIES), TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

11. FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

12. FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE

13. FIREARM: RIFLE, MNF:  RUGER, TYPE: RIFLE, MODEL:  PRECISION RIFLE, CAL: 308, SN: NONE

14. FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

15. FIREARM: RIFLE, MNF:  UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL:  SKS, CAL: 762, SN: NONE, OBLITERATED: YES

16. FIREARM: RIFLE, MNF:  DPMS INC.(DEFENSE PROCUREMENT MFG. SERVICES), TYPE: RIFLE, MODEL:  PANTHER LR-308, CAL: 308, SN: NONE

17. FIREARM: HANDGUN, MNF:  FEDERAL ARMAMENT, LLC (FEDARM), TYPE: PISTOL, MODEL:  FP-15, CAL: ZZ, SN: NONE, OBLITERATED: YES



18. FIREARM: RIFLE, MNF: SPIKE'S TACTICAL LLC, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

19. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: NONE

20. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

21. FIREARM: HANDGUN, MNF: UNKNOWN MANUFACTURER, TYPE: PISTOL, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

22. FIREARM: HANDGUN, MNF: UNKNOWN MANUFACTURER, TYPE: PISTOL, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

23. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE

24. FIREARM: RIFLE, MNF: NOREEN FIREARMS LLC, TYPE: RIFLE, MODEL: BAD NEWS ULR, CAL: 50 BMG, SN: U1508

25. FIREARM: RIFLE, MNF: SAVAGE, TYPE: RIFLE, MODEL: 110BA, CAL: 338, SN: 102090MDT

26. FIREARM: RIFLE, MNF: SAVAGE, TYPE: RIFLE, MODEL: 111LR HUNTER, CAL: 338, SN: NONE, OBLITERATED: YES

27. FIREARM: RIFLE, MNF: SAVAGE, TYPE: RIFLE, MODEL: 110, CAL: ZZ, SN: NONE, OBLITERATED: YES

28. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: NONE, OBLITERATED: YES

29. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: NONE, OBLITERATED: YES

30. FIREARM: RIFLE, MNF: NORINCO (NORTH CHINA INDUSTRIES), TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: 24087980P

31. FIREARM: RIFLE, MNF: PALMETTO STATE ARMORY, TYPE: RIFLE, MODEL: UNKNOWN TYPE, CAL: ZZ, SN: NONE, OBLITERATED: YES

32. FIREARM PARTS AND ACCESSORIES, NIGHT SUPER SCOPE 3X78 PLUS CHARGING ACCESSORIES

34. FIREARM: RIFLE, MNF: DPMS INC.(DEFENSE PROCUREMENT MFG. SERVICES), TYPE: RIFLE, MODEL: PANTHER LR-308, CAL: 308, SN: 76837

35. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: NONE, OBLITERATED: YES

36. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: NONE, OBLITERATED: YES

*GWM*

37. FIREARM: RIFLE, MNF: UNKNOWN MANUFACTURER, TYPE: RIFLE, MODEL: SKS, CAL: 762, SN: NONE, OBLITERATED: YES

38. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

39. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

40. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

41. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

42. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

43. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

44. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

45. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

46. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

47. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

48. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

49. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

50. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

51. AMMUNITION, QTY: 1028, MNF: OTHER, CAL: 308

52. AMMUNITION, QTY: 746, MNF: OTHER, CAL: 338

53. AMMUNITION, QTY: 655, MNF: OTHER, CAL: 308

54. AMMUNITION, QTY: 1383, MNF: OTHER, CAL: MULTI

56. AMMUNITION, QTY: 1068, MNF: OTHER, CAL: 308

57. AMMUNITION, QTY: 1153, MNF: OTHER, CAL: 762

58. AMMUNITION, QTY: 432, MNF: OTHER, CAL: 308

59. AMMUNITION, QTY: 1000, MNF: WOLF, CAL: 762

60. AMMUNITION, QTY: 1000, MNF: WOLF, CAL: 762

61. AMMUNITION, QTY: 1000, MNF: OTHER, CAL: 762

62. AMMUNITION, QTY: 517, MNF: OTHER, CAL: 338

63. AMMUNITION, QTY: 933, MNF: OTHER, CAL: 308

64. AMMUNITION, QTY: 758, MNF: OTHER, CAL: 308

65. AMMUNITION, QTY: 472, MNF: OTHER, CAL: 308

66. AMMUNITION, QTY: 1000, MNF: WOLF, CAL: 762

67. AMMUNITION, QTY: 1000, MNF: WOLF, CAL: 762

GM

68. AMMUNITION, QTY: 1000, MNF: WOLF, CAL: 762

69. AMMUNITION, QTY: 614, MNF: OTHER, CAL: 308

70. AMMUNITION, QTY: 466, MNF: OTHER, CAL: 308

71. AMMUNITION, QTY: 1000, MNF: WOLF, CAL: 223

72. AMMUNITION, QTY: 626, MNF: OTHER, CAL: 762

73. AMMUNITION, QTY: 167, MNF: OTHER, CAL: 223

74. FIREARM PARTS AND ACCESSORIES, (21) PMAG .223 MAGAZINES

75. FIREARM PARTS AND ACCESSORIES, MISC FIREARMS PARTS AND
    ACCESSORIES TO INCLUDE SCOPES, MAGAZINES AND AMMO STRIPS

## ATTACHMENT C

**A. Items Seized from Container No. GESU456254 on May 20, 2019**

1.  31 PAIRS OF BELLVILLE DESERT COLORED GORTEX MILITARY BOOTS STYLE 790

2.  17 CAMELBACK HYDRATION PACKS

3.  (1) ONE BRINKS VEST

4.  TRIP WIRE

5.  DOOR BELLS

6.  TRIP WIRE COMPONENTS

7.  WOODLAND CAMOUFLAGE MILITARY FLAK VEST

8.  TWO MACHETES WITH PACKAGING

9.  BLACK MOLLE TACTICAL VEST

10. CAMOUFLAGE SUIT

11. 2 GAS MASKS

12. CAMOUFLAGE FACE PAINT AND PACKAGING

13. 4 GHILLIE SUITS

14. 7 CAMOUFLAGE HATS WITH LIGHTS

15. 782 MILITARY STYLE HARNESS

16. 1 PAIR OF RUBBER BOOTS

17. HAND SAW

18. CAMOUFLAGE DUVET COVER

19. CAMOUFLAGE BALACLAVA

20.     1 PACK ZIP TIES

21.     CAMOUFLAGE HELMET (NOT KEVLAR)

22.     1 PAIR OF GOGGLES

23.     E-TOOL (MILITARY SHOVEL)

24.     1 PAIR CAMOUFLAGE LIGHTWEIGHT GLOVES

25.     1 HELMET BRACKET FOR NIGHT VISION

26.     1 SET OF BLACK ARM SLEEVES


B. **Items Seized from Container No. GESU456254 on August 1, 2019**

1.     2 PAIRS OF BELLVILLE DESERT COLORED GORTEX MILITARY BOOTS
       STYLE 790